**James McCLAIN, Plaintiff,**

v.

**NRM CORPORATION, Defendant.**

No. 82 C 3701.

United States District Court,
N.D. Illinois, E.D.

March 11, 1983.

Keith Young, Chicago, Ill., for plaintiff.

R.C. Bollow/J.A. Hall/G.A. Niemann, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff James McClain ("McClain") brought this action against defendant NRM Corporation ("NRM") seeking damages on the alternative theories of strict products liability and negligence in tort for injuries sustained while operating a machine allegedly manufactured by NRM.[1] The matter is presently before the Court on NRM's motion for summary judgment. For the reasons set forth below, the motion will be granted.

### I.

A motion for summary judgment will not be granted unless there are no genuine issues of material fact. *Cedillo v. International Association of Bridge and Structural Iron Workers Local Union No. 1,* 603 F.2d 7, 10 (7th Cir.1979). The undisputed facts are set forth as follows.

At the time he was injured, McClain was employed by Continental Can Company ("Continental") as a line adjuster on a plastic extrusion line. The function of such an extrusion line is to make plastic bottles from small pellets of plastic. The line is comprised of an extruder and "downstream" equipment, which includes a screen chamber and culminates in a blow molding machine. Plastic pellets are fed into the extruder, which is a long, cylindrical metal unit (referred to as a barrel) electrically heated along seven separately controlled and contiguous heat zones. The plastic material is mixed and pushed along as it melts by a metal screw rotating within the barrel. At the end of the barrel is an adapter to which a screen chamber is attached. The screen chamber contains removable wire mesh screens through which the melted plastic flows to filter out impurities. A second adapter connects the screen chamber to the die, where the plastic is shaped and then fed into a blow molding machine to be blown by air pressure into bottle form. Five contiguous heat zones in the downstream equipment provide heat to keep the plastic at the proper temperature. A control panel is used to control and monitor the temperature level in each of the twelve heat zones. The control panel has a temperature gauge for each zone, which registers the actual temperature up to (but not above) the desired temperature.

As a function of normal use, the screens in the screen chamber must be changed periodically because of the build-up of impurities. Another problem that occurs fairly often is overheating, called "heat override." Electrical current for each heat zone passes through contactor points in the control panel. Each heat zone has a separate set of contactor points through which electricity flows to the heat zone when the points are touching. When operating correctly, the points disengage at the desired temperature (as set on the control gauge) and the flow of electricity (and thus heat) discontinues. Occasionally the contactor points stick together or fuse;[2] current then flows to the heat zone continuously, and a heat override occurs. The heat eventually causes gaseous pressures to build.

NRM manufactured the extruder (*i.e.,* the barrel) and the control panel for the

---

1. The action was originally brought in state court and removed to federal court by NRM. Subsequent to removal, plaintiff filed an amended complaint naming three additional defendants who allegedly manufactured component parts of the machine that caused plaintiff's injury. Because these three defendants destroyed diversity jurisdiction, the case was remanded to state court. These defendants were subsequently dismissed because they were joined after the applicable statute of limitations had run. The case was then removed once again to this Court.

2. Although this does not happen with great regularity, plaintiff notes that it was a "normal occurrence."

line. NRM did not design, manufacture, or distribute the screen chamber, its heating element, or any other piece of the downstream equipment. The extruder and the control panel were sold by NRM to Continental in 1968. NRM did not install the extrusion line nor did it advise Continental with respect to the choice or installation of the downstream equipment.[3]

The job of a line adjuster is to start the line and oversee its operation, making any adjustments that may become necessary. Continental trains its adjusters and provides them with a checklist for the start-up procedure. The checklist provides, *inter alia,* that before the line is started, the adjuster should check for heat override in all zones, check the heat in the screen change (*i.e.* chamber), and if the heat in the screen chamber is "O.K.", put on protective face shield and gloves and change the screens.[4]

On October 12, 1977, McClain was told by his supervisor to start Line No. 8, the extrusion line described above. As soon as McClain unlocked the bolt to change the screens, the wedge holding the screens blew out explosively; hot plastic also blew out, burning McClain and causing his injuries. Immediately after McClain's accident, his supervisor checked the line and found that the contactors providing electric current to the screen chamber heat zone were stuck together. Plaintiff alleges, and defendant does not dispute, that the cause of the explosion was heat override.[5]

**II.**

In moving for summary judgment, NRM contends that it cannot be held liable either in strict products liability or negligence for the malfunction of a piece of equipment that it did not design, manufacture, distribute, or install. McClain seeks to impose liability under two lines of reasoning and asserts that these two theories give rise to triable issues of fact, rendering summary judgment inappropriate. First, McClain contends that NRM should be held strictly liable on the grounds that the control panel was unreasonably dangerous. Second, McClain contends that NRM was negligent in failing to warn Continental of the danger of heat override and in not providing instructions with the control panel describing how to check for heat override.[6] We conclude that under the undisputed facts, neither theory is sufficient to impose liability upon NRM, and that consequently there are no triable issues of material fact.

McClain contends that the control panel was unreasonably dangerous in two ways: first, because the temperature gauges did not indicate the actual temperature in a heat zone if it went above the desired temperature, and second, because while the control panel contained devices to shut down the line automatically in the case of heat override in one of the first six zones, it contained no devices to shut down the line automatically if one of the last six zones overheated. McClain asserts that because NRM knew that heat overrides were "normal occurrences," it was unreasonably dangerous for NRM not to have incorporated

---

**3.** Deposition testimony indicates that there are different models of the various downstream components available. For example, the screens in the design used by Continental must be manually changed. Other models change the screens automatically, *e.g.,* with hydraulic pressure.

**4.** The checklist provides in relevant part:

5. When heats reach the desired settings—turn knob for each zone to raise heats 50°—if thermocouple indicator immediately follows the pointer—you have a heat override and that zone should be checked before plastic is started. If thermocouple doesn't move turn back to the original heat setting.

\* \* \* \* \* \*

26. Recheck gate—screen change and elbow heats. If O.K., put on protective face shield and gloves and change screens.

**5.** Marvin Salzenstein, plaintiff's expert witness, testified at deposition that in his opinion, a stuck relay contactor caused the temperature in the screen chamber to rise to above 600°, resulting in gaseous pressures that escaped with the unit's contents when McClain opened the unit. Salzenstein Deposition at 39–41.

**6.** NRM does not dispute that no instructions or warnings regarding heat override accompanied the control panel.

actual temperature gauges and automatic shut down devices in its control panel design.

▉ To establish a prima facie case of strict products liability, the plaintiff must prove both an unreasonably dangerous condition and that the injury resulted from the condition.

> To recover in strict liability, the injury must result from a condition of the product, the condition must be unreasonably dangerous and the condition must have existed at the time the product left the manufacturer's control.

*Hunt v. Blasius,* 74 Ill.2d 203, 23 Ill.Dec. 574, 384 N.E.2d 368, 372 (1979).

▉ In *Hunt,* plaintiffs had been injured when their automobile left the highway and collided with the post of an exit sign. Plaintiffs sought to impose strict liability on the designer of the post, contending that because collisions are foreseeable, it was unreasonably dangerous for defendant not to have used a safer "break-away" design. The Illinois Supreme Court rejected the contention with language apposite to the case at bar:

> ... [P]laintiffs have alleged no legally cognizable defect in the sign post. They have merely indicated a preference for "break-away" posts. However valid that preference might be, the availability of an alternative design does not translate into a legal duty in products liability. An action is not maintainable in products liability merely because the design used was not the safest possible. Here, there is no allegation of a defect in the post which affected its intended or actual use—to safely support the sign. The risks which inhered in the collision with the post were the same risks which attend all collisions between motorists and stationary objects which align the highway. In the absence of any facts which would indicate that the post, in supporting the sign, subjected motorists to any unreasonable or unexpected risks, we cannot sustain plaintiffs' action in strict liability.

23 Ill.Dec. at 584, 384 N.E.2d at 578.

In the instant case, neither McClain nor Continental was subjected to unreasonable or unexpected risk. Continental knew the risk of heat override and had devised procedures for the line to be checked for override prior to start-up despite the limitations of the control panel design. *See* n. 4, *supra.* McClain had been instructed in these procedures. We conclude that McClain has not alleged a legally cognizable design defect and thus NRM may not be held liable under a theory of strict products liability.

▉ McClain alternatively seeks to impose liability under a theory of negligence. He contends that NRM had a duty to warn Continental of the danger of heat override and to provide instructions on how to check for override, and that failure to include such warnings and instructions in the control panel instruction manual was a breach of that duty and a proximate cause of McClain's injuries. We reject McClain's contention outright. As emphasized above, Continental was well aware of the danger of heat override and had instructed the line adjusters in procedures to protect against it. Even assuming that NRM had a duty to Continental to provide warnings and instructions, NRM's breach of that duty can in no way be said to have been the proximate cause of McClain's injuries.

### III.

The undisputed facts preclude the imposition of liability on NRM under either a theory of strict liability or a theory of negligence. For the reasons stated above, NRM's motion for summary judgment is granted, and judgment is entered in its favor. It is so ordered.